# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DONOVAN DAVIS, JR.**,

Plaintiff,

v.

**FEDERAL BUREAU OF INVESTIGATION**, *et al.*,

Defendants.

Case No. 18-cv-0086 (CRC)

## MEMORANDUM OPINION

Donovan Davis, Jr. is a federal inmate who wants records relating to his investigation and prosecution. He submitted Freedom of Information Act ("FOIA") and Privacy Act requests to the Federal Bureau of Investigation ("FBI"), the United States Secret Service ("Secret Service" or "Service"), and the Executive Office of United States Attorneys ("EOUSA"). Dissatisfied with the agencies' responses, he filed this suit, challenging the adequacy of their searches and the legitimacy of their withholdings. All three agencies moved for summary judgment in November 2018. But after a long delay in the briefing—owing in part to the lapse in federal appropriations—EOUSA moved to withdraw its motion. The Court granted that motion, leaving only the FBI's and Secret Service's motions for resolution. For the reasons that follow, the Court will grant each of them.

### I. Background

In May 2015, Mr. Davis was found guilty of various federal fraud offenses stemming from his participation in a Ponzi scheme and is currently serving a 204-month prison sentence at the Federal Correctional Complex in Coleman, Florida. See United States v. Davis, 767 F. App'x 714, 722 (11th Cir. 2019); Complaint, ECF No. 1, ¶ 4. On October 14, 2016, Davis filed

separate FOIA and Privacy Act requests with the FBI and Secret Service seeking "any and all records under [his] name and/or identifier assigned to [his] name," including anything related to his arrest, investigation, and prosecution. See Declaration of David M. Hardy ("First Hardy Decl."), Ex. A, ECF No. 11-4 at 51 (FBI request); Declaration of Kim E. Campbell ("First Campbell Decl."), Ex. A, ECF No. 11-7 at 19 (Secret Service request).

The FBI responded to Davis's request in August 2017. Compl. ¶ 22; First Hardy Decl. ¶ 10. It informed Davis that it had reviewed 149 potentially responsive pages and provided 72 of those pages. First Hardy Decl. ¶ 10. The FBI also explained that, although many of the documents were exempt from disclosure in their entirety under the Privacy Act, 5 U.S.C. § 552(a)(j)(2), it processed Davis's request under FOIA because it "afforded the greatest degree of access authorized by both laws." Id. The FBI did not, however, provide Davis with a Vaughn index detailing its withholdings. Compl. ¶ 22. Davis appealed the FBI's response to the Department of Justice's Office of Information Policy ("OIP") on August 29, 2017; OIP affirmed the FBI's response in November 2017. See First Hardy Decl. ¶¶ 13, 15.

The Secret Service, for its part, responded to Davis in May 2017, noting that it had conducted a search and was reviewing documents for withholding determinations. First Campbell Decl. ¶ 9. Before any production occurred, in September 2017, the Secret Service told Davis that he could retrieve an external hard drive it had taken from Davis pursuant to a grand jury subpoena issued in 2009. Compl. ¶ 31. But when Davis's wife arranged to do so, she was informed that the drive had been erased. Id. ¶ 33. Davis alleges that after his wife retrieved the hard drive, she had it tested by a forensic expert, who concluded that the hard drive had been erased sometime *after* the Secret Service received Davis's FOIA request. Id. ¶ 37.

Davis filed suit in January 2018. See Compl. After the suit was filed, the FBI supplemented its earlier production while the Secret Service provided its first. As for the FBI, it reviewed an additional seven pages and released to Davis four of them; it also determined that certain segregable information on already-produced documents could be released in full. First Hardy Decl. ¶¶ 17–18. The Secret Service, meanwhile, provided Davis 228 pages of responsive records—74 in full and another 154 with redactions—and withheld completely another 79 pages. First Campbell Decl. ¶ 12. At the same time, the Secret Service determined that other potentially responsive records originated with the EOUSA and the Internal Revenue Service and referred the documents to them for processing. Id. ¶¶ 10–11.

The FBI and Secret Service believe that their responses have fulfilled their FOIA obligations and move for summary judgment, which Davis opposes.

## II. Legal Standards

FOIA cases are typically resolved on summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

An agency must carry two general burdens to earn summary judgment in a FOIA case. First, it must show "beyond material doubt that its search was reasonably calculated to uncover all relevant documents." Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 514 (D.C. Cir. 2011) (quoting Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999)) (internal quotation marks omitted). In reviewing an agency's search, courts examine the methods, not the fruits, of the search. CREW v. U.S. Gen. Servs. Admin., No. 18-CV-377, 2018 WL 6605862, at *3 (D.D.C. Dec. 17, 2018); Rodriguez v. U.S. Dep't of Def., 236 F. Supp.

3d 26, 34 (D.D.C. 2017). An agency "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). That showing can be made through declarations that detail "what records were searched, by whom, and through what process." Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 552 (D.C. Cir. 1994). Agency declarations are "accorded a presumption of good faith" and "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted).

In addition to demonstrating that it conducted an adequate search, an agency must also justify any withholdings it has made pursuant to a FOIA exemption. See, e.g., Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009). An agency may justify its withholdings through sufficiently detailed declarations, see, e.g., id., which will often be paired with so-called Vaughn indices that describe a withheld document and the reason the agency believes it qualified for a particular exemption, Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973). However, because the primary purpose of FOIA is disclosure, courts construe exemptions narrowly. See, e.g., DiBacco v. U.S. Army, 795 F.3d 178, 183 (D.C. Cir. 2015).

**III. Analysis**

The Court will assess the adequacy of the searches the FBI and Secret Service conducted before turning to the legitimacy of their withholdings.

A. FBI Search

Davis sought from the FBI "any and all records under [his] name and/or identifier assigned to [his] name," including anything related to his arrest, investigation, and prosecution.

See First Hardy Decl. at 51. Upon receipt of Davis's request, the FBI searched its Central

Records System ("CRS"), which "spans the entire FBI organization and encompasses the records

[of all FBI components]." Id. ¶ 19.

Because of the "enormous amount of information contained in the CRS," its records are

"indexed in a manner which meets the FBI's investigative needs and priorities, and allows FBI

personnel to reasonably and adequately locate pertinent files in the performance of their law

enforcement duties." Id. ¶ 21. The FBI explains that "[i]ndex searches of the CRS are

reasonably expected to locate responsive material within the vast CRS since the FBI indexes

pertinent information into the CRS to facilitate retrieval based on operational necessity." Id.

¶ 26. In other words, because indexing must be done properly to ensure records are readily

accessible to the Bureau in carrying out its law enforcement mission, the FBI says a search of

CRS indices should turn up information related to a one-time investigation target like Mr. Davis.

The index search conducted here was comprehensive. First, the FBI used a "three-way

phonetic breakdown of" Davis's name—"Davis, Donovan, George"—which meant "the

computer . . . searched the index for three different breakdowns of the name entered," and then

searched for any "80% or greater phonetic match[es]" with those three name breakdowns. Id.

¶ 27 n.15. The agency also conducted "on the nose searches," in which "the computer will

search exactly the name entered in the name field and only that name." Id. ¶ 27 n.17. On top of

that, the agency used Davis's "date of birth, social security number, and other identifying

information to facilitate the identification of responsive records." Id. ¶ 27. The search turned up

149 potentially responsive pages, 72 of which were released to Davis. Id. After Davis filed this

suit, the FBI conducted essentially the same search a second time. Id. ¶ 29. This search yielded

an additional seven potentially responsive pages, four of which were released to Davis. Id.

The FBI declaration describes a search that could "be reasonably expected to produce the information requested." Oglesby, 920 F.2d at 68. Davis wanted records relating to the FBI's investigation of him. The FBI searched the system that contains its investigation records for any records using a variety of formulations of Davis's name, combined with other identifying information unique to Davis. The declaration is beyond "reasonably detailed," it "set[s] forth the search terms and the type of search performed," and it "aver[s] that all files likely to contain responsive materials (if such records exist) were searched," thus providing a more than ample basis for summary judgment. Id.; see also Steinberg, 23 F.3d at 552 (summary judgment on search claim may be warranted where declaration explains "what records were searched, by whom, and through what process").

Further proof of the search's propriety is in the pudding. Although courts cannot conclude that an agency's search was inadequate solely by reference to its return, Rodriguez, 236 F. Supp. 3d at 34, the fact that a search turned up the very documents the requester sought provides strong evidence that the agency conducted an appropriate search. Davis asked for "any and all records under [his] name and/or identifier assigned to [his] name," including anything related to his arrest, investigation, and prosecution, see First Hardy Decl. at 51, and the initial search returned records related to various case files associated with Davis's name, id. ¶¶ 27–28. Davis used those case file numbers to supplement his FOIA request, but the FBI says that "all records pertaining to [Davis] serialized in these files numbers were processed and released" the first time around. Id. ¶ 28. That the FBI's first search located the case files associated with Davis, and that even a request targeting those specific case file numbers did not return any additional records, strongly supports the adequacy of the Bureau's search.

Undeterred, Davis contends that the FBI's search was inadequate because it "relied on a search of its own index system, not of its records." Opposition to Summary Judgment ("Opp."), ECF No. 12, at 3. He insists that "if the personnel inputting the data did not happen to use the same words or terms as contained in [his FOIA request], then the documents would not be located." Id. Worse still, Davis says index searches are "gameable," because the agency could ostensibly index records in a manner that makes them difficult to retrieve via FOIA requests. Id. What the FBI *should* have done, according to Davis, is "to notify [him] that an indexing search would be conducted, and to have asked [him] for his input on appropriate search terms." Id. Alternatively, Davis says the Bureau should have "notif[ed] the handful of agents involved [in his investigation] to provide the government's FOIA officers with copies . . . of all documents [ ] related to the agents' investigation of [him]." Id.

These arguments fail. First, with respect to Davis's argument that the FBI should have consulted with Davis to devise appropriate search terms, nothing in law or logic compels agencies to take such action in processing a FOIA request. As the FBI observes, "[Davis] cites no legal support for this argument because there is none." Reply in Support of Motion for Summary Judgment ("Reply"), ECF No. 21, at 2. Instead, case after case makes plain that "a FOIA petitioner cannot dictate the search terms for his or her FOIA request." Bigwood v. U.S. Dep't of Def., 132 F. Supp. 3d 124, 140 (D.D.C. 2015); see also, e.g., Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the court should attempt to micromanage the executive branch.").

Second, Davis's argument that the search would fail if the original indexing of his records did not track the language of his FOIA request is patently incorrect. The Bureau

searched for various formulations of Davis's name, including for inexact phonetic matches, and the search in fact located case files associated with him.

Third, Davis's suggestion that index searching is impermissible because the FBI might index records in a manner intended to prevent their discovery later on warrants little discussion. As an initial matter, it is the sort of "purely speculative claim[ ]" that cannot establish the inadequacy of an agency's search. SafeCard Servs., Inc., 926 F.2d at 1200. But Davis's theory doesn't hold water regardless. He suggests that the FBI might deliberately index records relating to a particular investigation target in a manner that makes their later discovery via an index for the target's name unlikely. That would be self-defeating. If an agent needed to locate a case file, he too must conduct an index search of the CRS; had he indexed the file improperly the first time around, or perhaps had another FBI official done so, the agent would be out of luck. On top of its poor logic, Davis's theory is belied by the search returns themselves. If Davis were right that the Bureau attempts to "game" FOIA by indexing records in a manner that requires insider knowledge to locate later on, how can he explain the 150-some responsive pages turned up by the search conducted in this case?

Fourth and finally, there is Davis's contention that the FBI search must have been faulty because it did not locate "records revealing how and when the FBI transferred the evidence to other government agencies." Opp. at 3. Davis's belief that such records should exist is based on a mistaken claim in the FBI's first declaration that its investigation led to Davis's conviction. See First Hardy Decl. ¶ 45. But as the FBI clarifies in a supplemental declaration, its investigation closed many years prior to Davis's 2015 trial and it had nothing to do with his prosecution or conviction. Second Declaration of David M. Hardy ("Second Hardy Decl."), ECF No. 21-1, ¶ 6. That explains the absence of records showing the FBI's coordination with the

federal entities involved in Davis's ultimate prosecution.[1]  And, in any event, a detailed agency declaration "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  SafeCard Servs., Inc., 926 F.2d at 1200.  When that declaration outlines a search methodology that can be reasonably expected to uncover responsive records, the agency's search is not rendered unreasonable just because it failed to uncover particular records the FOIA requester thinks must exist.  See Rodriguez, 236 F. Supp. 3d at 34.

For these reasons, the Court concludes that the FBI conducted an adequate search.

B.  Secret Service Search

Davis sought from the Secret Service the exact same set of records he requested from the FBI—in short, any and all records "under [his] name and/or identifier assigned to [his] name." First Campbell Decl. at 19.  The Secret Service determined that its Office of Investigations would be the most likely custodian of responsive records and asked that office to conduct the search for Davis's request.  Id. ¶¶ 13–14.  The Office of Investigations, in turn, forwarded the request to the Service's Orlando Field Office, because agents in that office had spearheaded the investigation into Davis.  Id. ¶ 15.  The Orlando Field Office located responsive records in a case file that was "accessible under Plaintiff's name, date of birth and social security number."  Id. ¶ 16.  Additionally, the Office of Investigations determined that one of its components, the Investigative Support Division ("ISD"), might have responsive records and asked it to conduct

---

[1] According to a DOJ press release reporting Davis's sentencing, the key law enforcement players in Davis's investigation were the IRS, the Secret Service, and state of Florida entities.  Department of Justice, *Florida Businessman Sentenced to 17 Years in Prison for Conspiring to Defraud Investors* (Aug. 27, 2015), https://www.justice.gov/opa/pr/florida-businessman-sentenced-17-years-prison-conspiring-defraud-investors.

its own search.  Id. ¶ 18.  ISD searched its databases for Davis's name, date of birth, and social security number—but came up empty-handed.  Id. ¶ 19.

The Secret Service declaration, like the FBI's, describes a search that could "be reasonably expected to produce the information requested."  Oglesby, 920 F.2d at 68.  Davis sought records relating to the Service's investigation of him.  The Service asked its Orlando Field Office to conduct the search (given that it had been charged with carrying out the Davis investigation) but for good measure also had ISD conduct a search that might uncover any records outside the Orlando Field Office's domain.  First Campbell Decl. ¶¶ 16–19.  To be sure, the Service's declaration is not nearly as detailed as the FBI's; while both searched for Davis's name, the FBI explained exactly how it searched for his name, and the Service does not.  All the same, the Service's declaration still "set[s] forth the search terms and the type of search performed" and "aver[s] that all files likely to contain responsive materials (if such records exist) were searched," thus providing firm-enough ground for summary judgment.  Oglesby, 920 F.2d at 68; see also Steinberg, 23 F.3d at 552 (summary judgment on search claim may be warranted where declaration explains "what records were searched, by whom, and through what process").  Courts in this district have previously sanctioned searches based on strikingly similar declarations.  See Keys v. Dep't of Homeland Sec., 510 F. Supp. 2d 121, 126 (D.D.C. 2007) ("[T]he Secret Service used Plaintiff's name, social security number and date of birth to search for responsive documents in the Master Central Index.")

Moreover, as was true of the FBI, the Service's search bore substantial fruit.  It ultimately produced to Davis 228 pages of responsive records and withheld in full another 79 responsive pages.  Id. ¶ 12.  While the efficacy of one search does not rule out the possibility that another search might be even more fruitful, it does provide evidence that the Service took a reasonable

approach to unearthing records relating to its investigation of Davis. It would be odd indeed if only *some* records related to Davis were discoverable via a search for his name, birth date, and social security number.

Davis nevertheless faults the Service's search for failing to turn up a grand jury subpoena that is referenced in some of the records it produced to him. Opp. at 8. Davis does not identify with much specificity the subpoena he thinks the Service's search should have yielded, so it is not obvious to the Court that any reasonable search in this case should have located it. Even if the subpoena were closely connected to Davis's investigation, the Court has already explained that "the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984). Once the agency establishes, as the Service has done here, that its search was reasonable, "[m]ere speculation that as yet uncovered documents may exist does not undermine [that] finding[.]" SafeCard Servs., Inc., 926 F.2d at 1201. And while "[i]n certain circumstances, a court may place significant weight on the fact that a records search failed to turn up a particular document," Davis here "fails to offer evidence of circumstances sufficient to overcome an adequate agency affidavit." Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003). He does not, for instance, "maintain that the [Service] failed to search particular offices or files where the document might well have been found," nor does he "maintain that the [Service] ignored indications . . . in its initial search that there were additional responsive documents elsewhere." Id.

The Court concludes that the Secret Service conducted an adequate search.

C.  Withholdings

The FBI and Secret Service withheld responsive records pursuant to FOIA Exemptions 3, 6, and 7(C), 7(D), and 7(E).  The Court will consider their explanations for each exemption in turn.

   1.  *Exemption 3*

Under Exemption 3, an agency need not disclose records that are "specifically exempted from disclosure by statute" if that statute "requires that matters be withheld from the public in such a manner as to leave no discretion on the issue; or establishes particular criteria for withholding or refers to particular types of matters to be withheld; and if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph."  5 U.S.C. § 552(b)(3).

*The FBI.*  The FBI argues that the Bank Secrecy Act ("BSA") requires that certain records responsive to Davis's request be withheld under Exemption 3.  The BSA and its implementing regulations provide that "a [BSA] report and records of reports are exempt from disclosure under [FOIA.]"  31 U.S.C. § 5319; see also 31 C.F.R. § 1010.960.  "[I]t is firmly established in this Circuit that the BSA is a proper basis for invoking an Exemption 3 withholding."  Rosenberg v. U.S. Dep't of Immigration & Customs Enf't, 13 F. Supp. 3d 92, 116 n.9 (D.D.C. 2014); see also Yunes v. U.S. Dep't of Justice, 263 F. Supp. 3d 82, 86 (D.D.C. 2017).  The only question, then, is whether the records the FBI withheld qualify as a BSA "report" or "records of reports."  The FBI says they do: the withheld records "relate to the criminal investigation at issue and were obtained through the BSA" and "involve[ ] BSA reports

or records of reports."  First Hardy Decl. ¶ 43.  As such, according to the FBI, those records must be withheld pursuant to Exemption 3.

The Court agrees.  Although documents that *involve* BSA reports or records of reports— as the FBI describes the withheld documents here—are not, strictly speaking, the same thing as actual BSA reports or records of reports, Davis does not bother to challenge the FBI's invocation of Exemption 3 in his opposition.  And even if he had done so, it likely would make no difference, for the Bureau invoked Exemption 3 "in conjunction with FOIA Exemption coded categories (b)(7)(E)-1 and (b)(7)(E)-5."  Id.  Therefore, even if not all of the withheld information qualifies as a BSA report or record of a report (and thus subject to Exemption 3), what remains would likely still be exempt from disclosure under Exemption 7.

*The Secret Service.*  The Secret Service withheld records under Exemption 3 that it claims were subject to Federal Rule of Criminal Procedure 6(e), "which bars the disclosure of matters occurring before a grand jury" and "is recognized as a 'statute' for Exemption 3 purposes."  Chase v. U.S. Dep't of Justice, 301 F. Supp. 3d 146, 154 (D.D.C. 2018) (citing Fund for Constitutional Gov't. v. Nat'l Archives & Records Serv., 656 F.2d 856, 867 (D.C. Cir. 1981)).  Rule 6(e)'s "grand-jury-secrecy requirement is applied broadly and embraces any information that 'tend[s] to reveal some secret aspect of the grand jury's investigation, [including] the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like.'"  Id. (quoting Lopez v. Dep't. of Justice, 393 F.3d 1345, 1349 (D.C. Cir. 2005)) (alterations in original). "[D]isclosure of matters occurring before the grand jury is the exception and not the rule."  Fund for Constitutional Gov't., 656 F.2d at 868.

The Secret Service withheld material on two pages of responsive records that it says "would reveal matters occurring before a grand jury." First Campbell Decl. ¶ 27. Davis complains that the agency's description of the withheld material is too vague to assess the applicability of Rule 6(e), noting correctly that "[t]he mere fact that information has been presented to the grand jury does not itself permit withholding." Opp. at 8. Davis has a point that the Service did not identify the withheld information with much specificity in its first declaration, but its supplemental declaration clarifies any ambiguity. See Supplemental Declaration of Kim E. Campbell ("Second Campbell Decl."), ECF No. 21-2, ¶¶ 3–7. It explains that the redacted sentences "identify a witness before a grand jury and the outcome of this grand jury," id. ¶ 3, and contain information that "provides insight into the deliberative process, identifies a witness who appeared before the grand jury, and reveals the inner workings of a federal grand jury," id. ¶ 7. Information like that falls squarely within Rule 6(e). Chase, 301 F. Supp. 3d at 154 (explaining that Rule 6(e) applies to "the identities of witnesses or jurors" and "the deliberations or questions of jurors, and the like"). And because Rule 6(e) information may be withheld pursuant to Exemption 3, the Secret Service acted lawfully in doing so.

2. *Exemptions 6 and 7(C)*

Exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The catchall provision 'similar files' includes any '[g]overnment records on an individual which can be identified as applying to that individual.'" Prechtel v. FCC, 330 F. Supp. 3d 320, 329 (D.D.C. 2018) (quoting U.S. Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982)). If the withheld information qualifies as "personnel and medical files and similar files," it is covered by Exemption 6 so long as the "privacy interest in non-disclosure" is

greater than "the public interest in the release of the records." Lepelletier v. FDIC, 164 F.3d 37, 46 (D.C. Cir. 1999). But the "presumption in favor of disclosure [under Exemption 6] is as strong as can be found anywhere in the [FOIA]." Wash. Post Co. v. HHS, 690 F.2d 252, 261 (D.C. Cir. 1982).

Exemption 7(C) similarly shields from disclosure information "compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of privacy." 5 U.S.C. § 552(b)(7)(C). Information is "compiled for law enforcement purposes" if it was gathered "to determine whether there was 'an identifiable possible violation of law.'" Butler v. U.S. Dep't of Labor, 316 F. Supp. 3d 330, 336 (D.D.C. 2018) (quoting Birch v. U.S. Postal Serv., 803 F.2d 1206, 1210 (D.C. Cir. 1986)). If the information qualifies as such, the question, as with Exemption 6, is whether the personal privacy interest outweighs the public's interest in disclosure. See Weisberg, 745 F.2d at 1491. If it does, Exemption 7(C) may properly be invoked.

*The FBI.* The Bureau invoked Exemptions 6 and 7(C) to withhold information that identified special agents and various other FBI employees, individuals interviewed in the Davis investigation, and third parties who were merely mentioned in the investigative files but did not participate in the investigation. See First Hardy Decl. ¶¶ 48–55. Given that Davis does not contest the propriety of any of these exemptions in his opposition, the Court will not address each of them in detail. A discussion of the first set of privacy exemptions, pertaining to FBI employees, will suffice.

The Bureau maintains it withheld information under Exemptions 6 and 7(C) "because doing otherwise would compromise the work and safety of Special Agents and support personnel connected to this investigation and others." Mem. Supp. Def's Mot. Motion for Summary

15

Judgment ("MSJ"), ECF No. 11-1, at 13 (citing First Hardy Decl. ¶¶ 48–49). It explains that "[p]ublicity (adverse or otherwise) regarding any particular investigation to which [special agents] have been assigned may seriously prejudice their effectiveness in conducting other investigations." First Hardy Decl. ¶ 48. The Bureau also avers that protecting the identity of its agents protects against "unnecessary, unofficial questioning as to the conduct of this or other investigations," since targets of FBI investigations can "carry a grudge which may last for years" and "may seek revenge on the agents and other federal employees involved in a particular investigation." Id.

As for the public interest in disclosure against which those private interests must be weighed, the FBI "could identify no discernible public interest in the disclosure of this information because [it] would not shed light on the operations and activities of the FBI." Id. Davis, for his part, does not even address the Bureau's privacy argument. Because the parties point to no public interest that would be served by disclosure, and because the Court will not supply one, the FBI employees' privacy interests must carry the day.[2] For "something, even a modest privacy interest, outweighs nothing every time." Nat'l Ass'n of Retired Fed. Emps. v. Horner, 879 F.2d 873, 879 (D.C. Cir. 1989). This pattern persists for each set of individuals for which the FBI invoked Exemptions 6 and 7(C): the Bureau gave reasons why disclosure would

---

[2] To be sure, the Court does not mean that the privacy interests will always prevail and inevitably permit withholding the names of law enforcement agents. Although they are "generally exempt from disclosure," they may be subject to disclosure "where they are required to confirm or refute allegations of improper government activity." Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1115 (D.C. Cir. 2007) (citing SafeCard Servs., Inc., 926 F.2d at 1205–06). But "[e]ven then, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred in order to gain disclosure." Id. (internal quotation marks omitted). Davis, however, neither argues that the disclosure of names here would reveal government misconduct nor offers any evidence that would support such a conclusion.

invade important privacy interests, and Davis offered no public interest that might justify such an invasion. The Court therefore holds that the FBI properly withheld information identifying its employees, individuals involved in the Davis investigation, and other third parties whose names were mentioned in the case files pursuant to Exemptions 6 and 7(C).

*The Secret Service*. The Service invoked Exemptions 6 and 7(C) to withhold the names, cell phone numbers, and email addresses of third parties who provided information in the Service's investigation of Davis, First Campbell Decl. ¶ 33, and also the identities and identifying information of law enforcement personnel involved in the investigation, id. ¶ 35. The Service explained that disclosure of the former "could cause unwarranted attention" on the third parties, id. ¶ 33, while disclosure of the latter "may seriously prejudice [the law enforcement officials'] effectiveness in conducting other investigations" and subject them to "unnecessary, unofficial questioning" regarding their work, id. ¶ 35. The Service further determined that no public interest justified disclosure of either subset of information because "such information reveals nothing about the manner in which the Secret Service conducts its activities." Id. ¶ 34 (respecting third party information); see also id. ¶ 36 (stating same about officials' information).

Davis again fails to offer a countervailing public interest in disclosure, or otherwise challenge the Service's invocation of Exemptions 6 and 7(C). And the Court, again, cannot conjure a compelling public interest on its own. Thus, just as it held with respect to the FBI, so it holds with respect to the Service: it properly withheld the identifying information pursuant to Exemptions 6 and 7(C).

     *3. Exemption 7(D)*

Exemption 7(D) protects from disclosure "information compiled for law enforcement purposes" if its release "could reasonably be expected to disclose the identity of a confidential

source" or could disclose "information furnished by a confidential source" in the course of a criminal investigation.  5 U.S.C. § 552(b)(7)(D).  "[A]n agency must establish a source's confidentiality on a case-by-case basis, either by showing that the source 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'"  Shapiro v. CIA, 247 F. Supp. 3d 53, 67 (D.D.C. 2017) (quoting Williams v. FBI, 69 F.3d 1155, 1159 (D.C. Cir. 1995)).  Once an agency establishes either an express or implied grant of confidentiality, a FOIA requester can overcome that only by providing "absolutely solid evidence showing that the source . . . has manifested complete disregard for confidentiality."  Parker v. Dep't of Justice, 934 F.2d 375, 378 (D.C. Cir. 1991) (citation omitted).

The FBI withheld records containing "information that was provided by a confidential source where confidentiality was implied."  MSJ at 17; see First Hardy Decl. ¶¶ 33–39.  The Bureau avers that the source "provided invaluable assistance and detailed information specific in nature throughout the mail, wire, money laundering, and investment fraud investigation of [Davis,] and several co-conspirators."  First Hardy Decl. ¶ 57.  As for the circumstances from which a grant of confidentiality could be inferred, Shapiro, 247 F. Supp. 3d at 67, the FBI explains that the "individual could reasonably fear that disclosure of his/her identify would place him/her in danger of possible retaliation (financial or otherwise), or potential harassment," which would lead the source to "expect his/her identity and the information provided" to be kept confidential, First Hardy Decl. ¶ 61.  It further explains that "[t]he sources [sic] interactions with the FBI, and the providing of documentation concerning the investment fraud scheme, was conducted under such assurances of confidentiality, and warrants the protection of the source's name as well as the information the source provided."  Id.

Davis advances two arguments to pierce the confidentiality veil.  First, he says that "the FBI relies on an unsupported contention that the source is entitled to confidentiality" and contends that the FBI must identify "specific facts or evidence to support its exemption."  Opp. at 7.  This argument demands too much of the FBI.  True, the Supreme Court has "determined that it is unreasonable to infer that all FBI criminal investigative sources are confidential," but it has also said that "the Government often can point to more narrowly defined circumstances that will support the inference."  U.S. Dep't of Justice v. Landano, 508 U.S. 165, 179 (1993).  Those circumstances may include "the character of the crime" and the "source's relation to the crime." Id.  Here, the FBI has indicated that the source "provided valuable assistance and detailed information specific in nature throughout the mail, wire, money laundering, and investment fraud investigation" of Davis and his co-conspirators.  First Hardy Decl. ¶ 60.  It stands to reason that only a limited number of individuals would be familiar with the details of a financial fraud scheme, and that those individuals would likely be closely connected with the target of the investigation.  Public disclosure of the information the source provided—given that so few individuals are privy to such information—might inevitably betray the source's identity, and disclosure of the source's identity might make him or her a prime target for retaliation, as the FBI explains in its declaration.  See First Hardy Decl. ¶ 61.  Under such circumstances, it is reasonable to infer that the source would only have cooperated on the promise of confidentiality.

Second, Davis points out that the FBI, in its initial declaration, claimed the confidential source's information "helped lead to the eventual conviction of [Davis], and several co-conspirators," which Davis says is untrue.  First Hardy Decl. ¶ 57.  As explained above, however, the FBI's second declaration clarifies that the information it collected in its investigation was not actually used in Davis's eventual prosecution.  See Second Hardy Decl.

¶ 8.  Davis says this mistake is reason enough to deny the FBI's exemption.  Opp. at 10.  The Bureau, for its part, maintains that its invocation of Exemption 7(D) is "still accurate and valid" because the confidential source provided information in a criminal investigation.  Second Hardy Decl. ¶ 8.

If Davis means to argue that confidentiality should no longer attach when the source's information is not used to obtain a conviction, then the Court disagrees.  Exemption 7(D) applies to law-enforcement information that "could reasonably be expected to disclose the identity of a confidential source" or could disclose "information furnished by a confidential source" in the course of a criminal investigation.  5 U.S.C. § 552(b)(7)(D).  Case law does not recognize, and logic does not recommend, an extra-textual requirement that the information provided by the confidential source prove critical to obtaining a criminal conviction, or even that it be helpful.  Instead, all Exemption 7(D) requires is that the information was elicited on a confidential basis in the course of a criminal investigation.  The rationale underpinning the confidential source exemption is implicated even when the source's information proves useless.  Law enforcement personnel must be able to guarantee confidentiality so that sources will "furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear their cooperation with the FBI will later be made public."  First Hardy Decl. ¶ 58.  The "release of a source's identity," regardless whether that source was crucial to a particular prosecution, "would forever eliminate that source as a future means of obtaining information" and would have a "chilling effect on the activities and cooperation of *other* sources providing information to the FBI."  Id. ¶ 59 (emphasis added).

Unpersuaded by either of Davis's arguments, the Court concludes that the FBI has adequately justified its Exemption 7(D) withholdings.

4. *Exemption 7(E)*

Under Exemption 7(E), an agency may withhold "information compiled for law enforcement purposes" if producing it "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). "This provision creates 'a relatively low bar for the agency [to meet] to justify withholding.'" Prechtel, 330 F. Supp. 3d at 334 (quoting Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011)). "[T]he exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." Mayer Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir. 2009). An agency need not make a "highly specific" showing of such a risk; it need only "demonstrate logically how the release of the requested information might create" one. Id. at 1194.

The FBI applied Exemption 7(E) to "non-public investigative techniques and procedures" and to "non-public details about techniques and procedures that are otherwise known to the public." First Hardy Decl. ¶ 68. Specifically, it withheld records revealing "the techniques and procedures [it] uses to collect and analyze information in connection with both criminal and national security investigations," id. ¶ 69; "sensitive information about investigative methods used by the FBI for [Davis's] investigation," which are also used in national security investigations more generally, id. ¶ 70; the "investigative focus" of certain FBI investigations, the release of which the Bureau says would reveal its "strength and weaknesses within certain

areas of the criminal arena," id. ¶ 71; "sensitive case file numbers, or sub-file numbers," which would reveal the "existence of [publicly] unknown investigations" and "their nature and geographical locations," when combined with case file information already in the public domain, id. ¶ 72, "non-public FBI secure email or IP addresses, and intranet web addresses," id. ¶ 73; and a "specific, sensitive law enforcement technique that was employed in the criminal investigation of [Davis]," id. ¶ 74.

The Bureau's declaration and brief expands on the rationale for withholding each subset of information, but the Court need not pause for long on those explanations—for Davis is silent in response. And given the "low bar" an agency must clear to justify an Exemption 7(E) withholding, Blackwell, 646 F.3d at 42, perhaps that is for the better. Once the Court applies, as it must, "a presumption of good faith" to the Bureau's representations, SafeCard Servs., Inc., 926 F.2d at 1200, it becomes evident that the FBI has offered a sufficient justification for its Exemption 7(E) withholdings. The withheld information concerns either non-public investigative techniques themselves, or information that might tangentially reveal information about how the FBI conducts investigations. And with each set of withholdings, the FBI has offered a more-than-plausible explanation for how disclosure would risk enabling the circumvention of the law. See Mayer Brown LLP, 562 F.3d at 1193. The Court therefore concludes that the Bureau's Exemption 7(E) withholdings were appropriate.

D. Wiped Hard Dive

Davis next complains that the Secret Service "destroyed material evidence" when it returned to Davis's wife a hard drive it had seized during the investigation—but only after wiping it of its data. Opp. at 8. According to Davis, almost a year after receiving his FOIA request, the Secret Service informed Davis that it possessed a hard drive he could retrieve; the

Service told Davis's wife that the hard drive had been wiped; the drive had not in fact been wiped, however, and the order to do so came *after* Davis's wife had arranged for its return. Davis appears to believe that this sequence of events establishes a FOIA violation.

Davis is correct to note that any agency cannot avoid its FOIA disclosure obligations by "intentionally transfer[ring] or destroy[ing] a document after it has been requested under FOIA." Chambers v. U.S. Dep't of Interior, 568 F.3d 998, 1004 (D.C. Cir. 2009). But the trouble with Davis's theory, as the government points out, is that it *assumes* "the hard drive in question must have contained responsive records" and "that an adequate search by the Secret Service would have necessarily involved a search of the hard drive." Reply at 6. To the contrary, there is no reason to believe "that the Secret Service had an obligation to search this hard drive for records that were responsive to a FOIA request [Davis] made." Id.

The Service maintains that "the hard drive in question was one that belonged to [Davis] and had been taken into evidence by the Secret Service in the course of investigating [him]." Reply at 5 n.2. Although it acknowledges that the hard drive was "wiped clean," it explains that was the "standard operating procedure[ ] for returning electronic evidence that includes personal identifying information and evidence of a subject's illegal activity." Id. Yet, regardless why the hard drive was wiped and whether it was done pursuant to "standard operating procedure," wiping a hard drive that belonged to Davis does not amount to a FOIA violation in this instance. Davis sought, *inter alia*, arrest reports, investigatory records, evidence reports, plea agreements, charging documents, and various other categories of records relating to the Service's investigation of him. See First Campbell Decl. ¶ 7. In other words, he wanted whatever records the Service had created that were about him. There is no reason to think that a hard drive owned by Davis and seized by the Service would contain such records. Because the hard drive does not

fall within Davis's request, he cannot show that the Service "intentionally transfer[red] or destroy[ed] a document after it has been requested under FOIA," making his reliance on Chambers misplaced.  See 568 F.3d at 1004.

    E.  Segregability

    One last issue remains for resolution.  FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  Although Davis does not appear to challenge the Bureau or Service on segregability, it is well established that "agencies and courts are obliged to determine whether nonexempt material can reasonably be segregated from exempt material." Powell v. U.S. Bureau of Prisons, 927 F.2d 1239, 1242 (D.C. Cir. 1991).  Accordingly, "it is error for a district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof."  Schiller v. NLRB, 964 F.2d 1205, 1210 (D.C. Cir. 1992) (citation omitted).  To meet its burden on segregability, an agency need only show "with reasonable specificity why [withheld] documents cannot be further segregated." Armstrong v. Exec. Office of the President, 97 F.3d 575, 580 (D.C. Cir. 1996).

    Both the FBI and Secret Service have done so.  The FBI withheld in full 80 pages because they "were fully covered by one or more of the cited FOIA exemptions, or because the FBI determined that any non-exempt information on these pages was so intertwined with exempt material that no information could be reasonably segregated for release."  First Hardy Decl. ¶ 75. And to the extent anything on those pages could have been released, that would require using "finite resources only to produce disjointed words, phrases, or sentences [that] would have minimal or no informational content."  Id.  The Secret Service likewise withheld in full 79 pages, First Campbell Decl. ¶ 12, after a "line-by-line review of all responsive records" revealed that

"further segregation was not possible because any non-exempt information is inextricably intertwined with exempt information and releasing it would yield a product with little, if any, additional informational value while expending substantial Secret Service time and resources," id. ¶ 58. Based on these uncontested representations, the Court concludes that the FBI and Secret Service made every reasonable effort to disclose segregable material.

**IV. Conclusion**

For the reasons set forth above, the Court will grant the FBI's and Secret Service's motions for summary judgment. A separate Order shall accompany this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  July 3, 2019